**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| EUGENE EDMOND,<br><br>Plaintiff,<br><br>vs.<br><br>AMAZON.COM SERVICES, LLC<br><br>Defendant. | ) | Case No. 1:23-cv-02735<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS IN SUPPORT OF HIS OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## I. There are Issues of Fact Concerning Whether the Reason for Termination is Pretextual

### A. Amazon's Contradictory Evidence Creates Genuine Issues of Material Fact Regarding the Applicable Kiosk Theft Policy.

1. According to Amazon's own witnesses, Amazon's practice was that it would not terminate an employee unless it found that the employee misused the food kiosk on three occasions. Bradley Dietz, Plaintiff's supervisor and Operations Manager for Amazon, testified that Amazon had a three strikes policy before terminating an individual for misuse of the food kiosk. See Exhibit 1, Dietz Dep. 86:2-18. Similarly, Eric Flores, a security manager who directly participated in the investigation that led to Edmond's termination and numerous other such investigations stated "Amazon Standard for their investigations" was three strikes. See Exhibit 2 Flores Dep. 45:7 to 46:11, See Exhibit 3, AMZN_001915.

2. Other key witnesses corroborated Dietz's and Flores's testimony concerning the three strikes rule. Quinton Jones, Human Resources Assistant at MDW8, testified that "[loss prevention] would observe theft three times, at least three times, before they would engage someone with any corrective action." See Exhibit 5, Jones Dep. 173:16-24 to 175:21. Jones was involved in at least twenty kiosk theft investigations. See Exhibit 5, Jones Dep. 197:9-12.

3. William Leader, who was employed as Operations Manager, supervised Edmond, and was similarly involved in theft investigations, testified that the rule was that an individual would not be fired unless he was caught stealing on three occasions. See Exhibit 4, Leader Dep. 12:18-24; 48:11 to 49:6; 87:15 to 88:24. According to Leader the three strikes rule was a "general rule" that was discussed in numerous meetings including security meetings. See Id. at 87:15 to 88:24.

4. As part of Edmond's termination in April 2021, Leigh Copeland ("Copeland"), Human Resources Business Partner, documented in writing that Amazon maintained a "zero tolerance" policy and thus she "recommended the termination for Eugene's actions". See Exhibit 6, AMZN_430. During her deposition, Ms. Copeland contradicted her written statement and testified that Amazon's actual practice was to initiate an investigation only after an employee had two instances of non-payment for kiosk items. See Exhibit 7, Copeland Dep. 128:3-9; 156:8-19; 159:3-24 to 160:1-3. When pressed, she later admitted that she did not know whether the "zero tolerance policy" she applied in Edmond's case applied to kiosk theft. See Exhibit 7, Copeland Dep. 159:16-24.

5. Flores, the security officer directly involved in Edmond's investigation, testified that Perry Smolinski ("Smolinski"), Loss Prevention Manager at MDW8 as well as Mike Nowalski Multi-Site Loss Prevention Supervisor informed him that Amazon's standard for kiosks investigations was three strikes. See Exhibit 2, Flores Dep. 45:7 to 46:12; Exhibit 8 Smolinski Dep. 43:6-9; 43:17 to 44:9. Flores additionally testified that the three strikes rule never changed at any point. See Exhibit 2, Flores Dep. 46:12-14.

**B. Edmond did Not Violate the Rule for Which He was Terminated.**

6. As part of its investigation, the EEOC requested from Amazon to "provide a ***complete copy*** of the investigation that led to the termination for the Charging Party." In response, Amazon produced an Investigation Report that only identifies HR's Leigh Copeland as the investigator. See Exhibit 6, AMZN_420 to 433 at 423 and 426.

7. Whereas that investigation accused Edmond of stealing on two occasions, it concluded that Edmond had violated the rule on only one occasion. See Id. More specifically, the conclusions section of the investigation report states:

> Overall Conclusion:
>
> Allegation: On 4/11/2021, between the time of 1:36pm and 1:38pm, respondent Eugene Edmond selects 2 items from the break room market place and does not attempt to make payment for the items. . .
>
> Based on the deliberate no attempt to pay for his transaction on 4/11/21 between 1:36pm and 1:38pm, the respondent commuted (sic) an act of misconduct – theft.

See Id.

8. Smolinski testified that the above identified investigation report substantiated only one incident of alleged kiosk theft: the April 11, 2021 transaction. See Exhibit 8, Smolinski Dep.143:16 to 145:8.

9. Amazon employees testified that they would not be in agreement with a termination for a single violation of the food kiosk rule.

a. Felicia O'Bryant ("O'Bryant), Human Resources Senior Assistant at the location where Edmond was employed (MDW8) testified that she would not agree with Edmond's termination if it was due to a single violation of the food kiosk policy and does not recall any Amazon employees being terminated for a single violation of the food kiosk policy. See Exhibit 9, O'Bryant Dep. 78:19-21; 82:24 to 83:13.

b. Michael Casale, Senior Operations Manager at Amazon testified that "nobody would ever be terminated for a one time misuse of the kiosk". See Exhibit 10, Casale Dep. 81:21 to 82:12.

c. The testimony from O'Bryant and Casale was confirmed by Leader who testified that terminating Edmond for one violation "would not make any sense". See Exhibit 4, Leader Dep. 92:22-24 to 93:10.

10. Leigh Copeland testified the termination of an Area Manager (Edmond's position at the time of termination) for theft would be "a group decision" by the leadership team and that "if we didn't have alignment" as to whether there was a violation of policy "then it would be my final determination on whether or not we would do it." See Exhibit 7, Copeland Dep. 110:8 to 111:4. In its Answers to Interrogatories, Amazon stated that Copeland made "the final decision to terminate Edmond" after consulting with five individuals. See Exhibit 11, Answers to Interrogatories No. 8.

**C. Even Under Amazon's Shifting Explanation of the Kiosk Rule, Edmond Did Not Violate the Rule.**

11. On March 3, 2011, Edmond scanned items from the kiosk, put his credit card into the payment terminal, and then heard the confirmation tone that the machine normally makes when a transaction goes through. See Exhibit 12, Ptf. Dep. 112:9-23; See Exhibit 6, AMZN_420 to 433 at 426. Edmond thus believed he had successfully paid for the items. Ptf. Dep. 87:15-23; 112:9-23.

12. When presented with the above facts[1], O'Bryant, HR Senior Assistant at MDW8, testified that she "doesn't think it was intentional theft" and that whether conduct constitutes a violation "comes down to an investigation and **intention**." See Exhibit 9, O'Bryant Dep. 77:11 to 78:15. A second HR Assistant - Quinton Jones, agrees with O'Bryant. See Exhibit 5, Jones Dep. 176:17-24 ("I am not convinced or persuaded that he had two strikes based on what I know of the incidents").

13. Similarly, when presented with the fact pattern -- an employee attempting to pay with a credit card when the machine malfunctions – Michael Casale testified: "in my opinion it's not fair without questioning the incident." See Exhibit 10, Casale Dep. 84:7-85:8.

[1] Specifically, O'Bryant was asked: "If an employee grabs something from the grab and go, okay. Scans the items, puts in his card but somehow the machine fails to register the sale and the employee consumes the items; is that a violation of Amazon policy?" O'Bryant Dep. 77:11-16.

14. Loss Prevention did not question the incident. See Exhibit 3, AMZN_001915. Smolinski's "investigation" shows that at most Plaintiff was asked about the 4/11/21 incident and not the 3/2/21 incident. See Exhibit 3, AMZN_001915 ("Smolinski reviewed the incidents specifically the incident on 04/11/21"). See Edmond's Decl. at Exhibit 14.

**D. Serious Questions Concerning the Alleged Investigation That Led to Edmond's Termination Create Issues of Fact.**

15. According to Smolinski, Loss Prevention -- rather than Human Resources -- is responsible for conducting investigations into kiosk theft. See Exhibit 8, Smolinski Dep. 166:8-10. Copeland agrees with Smolinski. She testified that "it was not her responsibility" to conduct investigations into physical theft. See Exhibit 7, Copeland Dep. 111:14-15. Yet, Copeland is identified as the only investigator in the Investigation Report Produced to the EEOC. See Plt. Add. Facts above ¶ 6.

16. Copeland has no training or experience conducting investigations into theft of physical items and cannot describe the process for conducting investigations into theft of physical items. See Exhibit 7, Copeland Dep. 112:10; 126:2-8.; See Exhibit 8, Smolinski Dep. 176:14-16. Even though Copeland made the decision to terminate Edmond, she cannot recall whether she reviewed any documents or videos related to the investigation that led to Edmond's termination. See Exhibit 7, Copeland Dep. 126:22-24 to 127:4.

17. Amazon's witnesses testified that security guards are not authorized to conduct investigations or fill out investigation reports. See Exhibit 7, Copeland Dep. 136:8-10; See Exhibit 8, Smolinski Dep. 144:12-17. Nevertheless, according to Smolinski (Loss Prevention Manager), security guard James Pope filled out the investigation report, conducted a substantial part of the investigation, and reached conclusions regarding Edmond's alleged violations. See Exhibit 8, Smolinski Dep. 121:20 to 122:4, 143:6 to 145:8

18. A review of the Investigation Reports produced by Amazon shows that the HR Report been manipulated. To the EEOC, Amazon produced an Investigation Report that identifies Leigh Copeland as the sole member of the "investigation team". See Exhibit 6, AMZN. 420 to 429 at 426. As part of its production of documents in this case, however, Amazon produced an Investigation Report that identifies both Copeland and O'Bryant as the "investigation team" and additionally identified O'Bryant as the "case owner" of the investigation. See Exhibit 13, AMZN 391-394. The version of the investigation produced to the EEOC has "some White-Out" over the "case owner" and "investigation members" field. See Exhibit 7, Copeland Dep. 138:1:23.

19. Even though O'Bryant's name was removed from the investigation presented to the EEOC, at her deposition Copeland testified that O'Bryant "created the investigation report" and was the "case owner" of the investigation that led to Edmond's termination. See Exhibit 7, Copeland Dep. 140:7-17.

20. Smolinski provided contradictory testimony. He testified that James Pope was the author of the Human Resources investigation report. See Exhibit 8, Smolinski Dep. 121:20 to 122:4 and *see generally* 143:6 to 145:8.

21. Whereas the investigation conducted by Human Resources identified James Pope as one of the investigators who "caught Eugene Edmond through footage" the investigation performed by Loss Prevention does not mention him at all. *Compare* Exhibit 6, AMZN 427-429 at 427 to Exhibit 3, AMZN_1910 to 1915. Moreover, whereas the investigation conducted by Loss prevention mentions that Eric Flores was part of the investigation team, the Human Resources investigation does not mention Flores at all. Id.

22. During the interview into the alleged theft, Edmond was not given an opportunity to refute the evidence brought against him. Smolinski and Copeland simply "cold called him" into an office (Ptf. Depo. 86:8-11) and immediately demanded "how many times did [he] do it". See Exhibit 12, Ptf. Dep. 86:16-18; 87:6-7. Smolinski and Copeland did not identify the specific dates when Edmond had allegedly taken items or which items he had taken. See Exhibit 12, Ptf. Dep. 87:12-14 and See Edmond's Decl. at Exhibit 14, Exhibit 14.

23. During the investigation, Edmond was not given an opportunity to provide evidence that he paid for the items. Copeland testified that "anything that occurred during the interview would be provided in my notes," and that if an employee was "given an opportunity to provide evidence that he paid" she would "write" that in her notes. See Exhibit 7, Copeland Dep. 153:12 to 155:2. When asked directly whether her notes reflected that Edmond was provided such an opportunity, Copeland admitted: "No." See Exhibit 7, Copeland Dep. 154:23 to 155:2.

24. O'Bryant – who according to Amazon was the author of one of the investigations into Edmond -- testified that as part of an investigation into food kiosk theft the employee should be given an opportunity to provide evidence of payment, and – significantly – that the employee's statement should be taken. Def. Stat. of Facts ¶ 46; See Exhibit 9, O'Bryant Dep. 80:9 to 81:6. Neither the investigation conducted by Loss Prevention or by Human Resources contain Edmond's statement. See Exhibit 6, AMZN_427-429; AMZN Exhibit 3, 1910 to 1915.

**E. A Reasonable Jury Could Conclude that Decision Maker Copeland is Biased**

25. Ms. Copeland – a white HR employee -- made the decision to fire two Black employees for alleged theft.[2] See Exhibit 11, Amazon's answer to interrogatories at ¶ 8. Both managers accuse Copeland of discrimination in this lawsuit.

26. During her deposition, Copeland made several statements that could be interpreted as discriminatory:

a. She stated that race can be used in making employment decisions in certain circumstances. See Exhibit 7, Copeland Dep. 77:1-24; 78:1-6.

[2] Copeland's decision aligns with the pervasive stereotype of Black men familiar to scholars of race discrimination – that of criminality. The perception of black men as inherently criminal has been a persistent and harmful stereotype perpetuated throughout history. See Exhibit 15, Nielsen Report at p. 13.

b. She suggested that calling a Black employee "ghetto" may not always violate Amazon's anti-harassment policy. See Exhibit 7, Copeland Dep. 89:18-24; 90:1-18.

c. She stated that calling a Black employee "poor, hungry and driven" is not necessarily a derogatory term. See Exhibit 7, Copeland Dep. 91:14-24; 92:1-20.

d. She testified that she does not know whether displaying a Confederate flag would violate Amazon policy despite understanding why a Confederate flag could be hurtful to Black Americans. See Exhibit 7, Copeland Dep. 93:1-12.

27. During her time at Amazon, Copeland was the subject of a race discrimination complaint, a separate retaliation complaint, and another separate ethics complaint. See Exhibit 9, O'Bryant Dep. 63:18 to 64:2, See Exhibit 16, AMZN 3178-3208 (retaliation); See Exhibit 17, AMZN p. 2838-2840 (ethics complaint), See Exhibit 7, Copeland Dep. 52:5-13. The ethics complaint was opened by another Human Resources employee Teri Truelove ("Truelove") against Copeland because according to Truelove, Copeland displayed favoritism for certain employees. See Exhibit 17, AMZN p. 2838-2840; See Exhibit 7, Copeland Dep. 59:17:22.

28. During her deposition, Copeland denied making the decision to terminate co-Plaintiff Jone's employment despite Amazon's sworn answer to interrogatories to the contrary. *Compare*, Exhibit 7, Copeland Dep.168:10-22 with Exhibit 11, Answer to Interrogatories at ¶8. In her deposition, she stated that the decision was made by Wesley Chrisos. See Id. Chrisos denied this allegation, testifying that if Copeland claimed he made the decision to terminate Jones, "that [would] be false." See Exhibit 18, Chiros Dep. 88:2-6.

29. Whereas Copeland terminated Quinton Jones for "stealing time", she admitted during her deposition that she had no evidence whatsoever that Jones was not working during the time periods she accused him of not working. See Exhibit 7, Copeland Dep. p. 173:3-10

30. Copeland failed to conduct a proper investigation to determine whether Jones was working during the times she accused him of theft. Specifically:

a. she did not speak to anyone at MDW8 to determine if they authorized Jones to work before recommending his termination. See Exhibit 7, Copeland Dep. 202:19-23

b. she did not look at emails or Chimes to see what Jones was doing during the times she identified him as stealing time. See Exhibit 7, Copeland Dep. 203:2-5

c. she did not examine Jones's computer activity during the times she accused him of theft, as she lacked the necessary authorization. See Exhibit 7, Copeland Dep. 203:6-9.

d. she did not request permission to look into Jones's computer to see if he was working during the time she accused him of time theft. See Exhibit 7, Copeland Dep. 211:5-12.

31. Worse, Copeland admitted during her deposition that she had authorized Jones to work from home during some specific time periods, yet she later used those exact same time

periods as the basis for terminating him for alleged time theft. See Exhibit 7, Copeland Dep. 204:2 to 205:4

32. Amazon's own HR professionals expressed grave doubts about Jones's termination and Copeland's conduct:

a. Immediately after Jones's termination, O'Bryant and two other HR professionals discussed that Jones should file an EEOC complaint as soon as possible because the termination "doesn't add up." See Exhibit 19, AMZN 2837.
b. O'Bryant expressed to HR professional Teri Truelove that Jones's termination made her "even more fearful" and that Truelove filing an ethics complaint against Copeland was "the best thing you could do." See Exhibit 17, AMZN 2838-2840.
c. O'Bryant told Truelove that she "felt I was really walking on eggshells" as Copeland questioned her about her knowledge of Jones's termination, and that she had witnessed Copeland twist the words of Truelove. See id.

**F. Evidence Shows that Employees Outside of Edmond's Protected Category Were Treated Better than Edmond.**

33. William Leader, Operations Manager at MDW8, testified that the kiosk theft rule "was inconsistently applied" and selectively invoked to remove unwanted employees – conduct he believed applied to Edmond. Leader Decl. ¶ 18; See Exhibit 4, Leader Dep. 92:2-24; 93:1-10.

34. Edmond testified that he was aware of many other white employees who violated the kiosk rule but were not terminated. See Exhibit 12, Ptf. Dep. 110:10-18; 152:5-18. His testimony was corroborated by Leader, who was directly involved in theft investigations. See Exhibit 4, Leader Dep. 12:20-24; 48:9-22. Based on his firsthand involvement and observations, Leader testified that there were "plenty of folks" who received only counseling or informal conversations rather than termination for kiosk policy violations. See Exhibit 4, Leader Dep. 88:19-24; 89:12-18.

35. Edmond's direct supervisor, Bradley Dietz, investigated whether Andrew Stone had stolen from the food kiosk. He was instructed to and personally conducted an informal "Seek to Understand" with Stone regarding his food kiosks activity. See Exhibit 1, Dietz Dep. 89:3-91:22. Dietz reviewed no documents or videos that would have illuminated the extent and frequency of Stone's violations -- including how many times Stone stole from the kiosk or how much he took -- and imposed no discipline whatsoever. See Exhibit 1, Dietz Dep. 89:3-91:22.

36. O'Bryant learned from an operations manager of Stone's conduct and yet failed to investigate, report, or discipline him. See Exhibit 9, O'Bryant Dep. 81:7-24; 82:1-9.

37. After Edmond's termination, Mike Casale called Edmond and apologized for the termination, stating that he knew it was unfair and that it was unfair that Edmond was terminated while Andrew Stone, who engaged in the same conduct, was not. See Exhibit 12, Ptf. Dep. 96:5-12; 124:9-15.

38. Quinton Jones testified that Johnathan Lidsky, also an Area Manager like Edmond, stole from the food kiosk but was not terminated. See Exhibit 5, Jones Dep. 205:3-9. Jones testified that Mike Nowalski – a multi-site loss prevention supervisor based out of MDW8 – told him this information. See Exhibit 5, Jones Dep. 205:3-9; See Exhibit 8, Smolinski Dep. 34:16-22; 36:23 to 37:1.

39. Stone was one of Dietz's boys, as Jones characterized him, who often got preferential treatment. See Exhibit 5, Jones Dep. 130:9 to 131-10; 133:12 to 134:16. When Stone failed his pod interview, Dietz improperly allowed him to remain in a seasonal area manager position rather than enforcing Amazon's standard six-month waiting period before attempting another pod. See Exhibit 5, Jones Dep. 130:9 to 131-10. Even though another candidate was interested in the seasonal role, Dietz ensured the position was held for Stone instead, thereby providing him preferential access to another pod opportunity. See Exhibit 5, Jones Dep. 131:7-10.

40. Stone and Lidsky held the same Area Manager position as Edmond during the relevant time period. See Exhibit 32, AMZN 1467-1468, identifying the names of all Area Managers during 2021 to 2023. Dietz specifically testified that both Edmond and Stone were Area Managers during the relevant time period. See Exhibit 1, Dietz Dep. 25:12-19. In contrast, Shahid Missri and Adam Waldera are not identified on the list as L4 or L5 Area Managers produced by Amazon. See id.

41. Between the years 2019 through 2021, Amazon terminated 19 individuals for alleged food kiosk theft. Out of those 19 individuals, 9 identified as Black, 6 identified as other minorities, 1 identified as one or more races ***and only 2 identified as white***. See Exhibit 22, AMZN 818.

## II. The Environment at MDW8 Was Hostile and Severe and Pervasive Against Black Individuals and against Edmond Specifically.

### A. MDW8 is Highly Racially Segregated

42. Amazon's MDW8 facility maintained a persistently racially segregated workforce that created conditions in which racial discrimination and stereotypes thrive. See Exhibit Nielsen 23 Dep. 52:1-24. Specifically, the EEO-1 reports show only three African-American employees ranked above the operative level in 2019 (with none in executive, or mid officials and management positions) whereas 18 white individuals held positions above this level. MDW8 fared no better two years later. In 2021 only 4 African-American employees ranked above the operative level with only one in executive or mid management positions, whereas 23 white individuals held these positions. See Exhibit 37, AMZN 409-411 and Exhibit 15, Nielsen Expert Report p. 6; Exhibit 23, Nielsen Dep. 52:1-24.

43. In the context of this racially segregated environment, warehouse employees at MDW8 displayed "White Lives Matter" paraphernalia and a Confederate flag throughout the facility. Despite witnessing this conduct, managers including Bradley Dietz and Cody Midgett failed to take any corrective action. See Exhibit 12, Ptf. Dep. 151:1-24; 152:1.

**B. Edmond Endured a Hostile Work Environment Based on his Race**

44. During his initial interview at MDW8, the interviewer rather than inquiring about Edmond's substantial qualifications, which included a bachelor's degree and extensive managerial experience, asked only questions about football and whether Edmond liked rap music because he is Black. See Exhibit 12, Ptf. Dep. 141:11-17; 142:17-24 to 143:1-10. That same interviewer later became one of Edmond's direct managers and repeatedly misidentified him by the name of another Black employee (Burt), stating "you guys all look alike" and referring to Edmond and the other Black employee as "Bert and Ernie from Sesame Street." See Exhibit 12, Ptf. Dep. 143:17-24 to 144:1-13. When Edmond refused to accept a damaged pallet, this same manager told him "all black folks are lazy." See Exhibit 12, Ptf. Dep. 144:5-13.

45. In or around August and September 2020, Dietz asked Edmond whether he had ever had a Jheri curl and whether he would be willing to "bring one back." See Exhibit 12, Ptf. Dep. 59:20 to 61:1. Around the time of the George Floyd riots, Dietz made comments in the workplace comparing protestors to "thugs who worked at MDW8" and characterizing Black Lives Matter protestors in Chicago as protesting only to get "free loot". See Exhibit 12, Ptf. Dep. 59:20 to 61:1; Exhibit 5, Jones Dep. 203:1-10.

46. Jones confirmed Edmond's direct supervisor Dietz used derogatory racial language. He testified that he heard Dietz "refer to a specific associate as ghetto" and compared the rioters around the time of the George Floyd riots, to the "thugs who worked at MDW8." See Exhibit 5, Jones Dep. 201:2-10; 202:18-24; 203:1-10. Jones also testified that Dietz made a racially offensive comment about a Black employee's potential for promotion, stating the employee had a "PHD," which Dietz defined as "poor, hungry and driven" —a characterization Jones identified as embodying "a harmful racial stereotype of Black individuals." See Exhibit 5, Jones Dep. 134:1-20.

47. According to both Leader and Edmond, Dietz intentionally created conditions designed to cause Edmond to fail by manipulating freight and metrics. Dietz would either fail to leave sufficient product for Edmond to meet his assigned productivity goals or would "override our trailer moves and put his own freight." See Exhibit 12, Ptf. Dep. 55:5-20; See Exhibit 4, Leader Dep. 45:5 to 46:9. Edmond would then be blamed for keeping the rates up. Leader Dep. 45:15-24. Moreover, Dietz would manipulate Edmond metrics so that "we would look like -- I would look like they were worse than they were." Ptf. Dep. 55:17-20.

48. Eleven days before terminating Edmond on April 30, 2021, on April 19, 2021, Dietz and Cody Midgett (the highest-ranking officer at MDW8 at the time) discussed terminating Edmond in a Chime conversation where they expressed frustration stating, "if he's not going to take his job seriously we dont (sic) need him around" and mockingly referred to Edmond as "the Black Mamba." See Exhibit 24, AMZN_002831-002836 (Chime communication at 2834 and 2835).

**i. An Uninterested Third Party Testified that Edmond Experienced a Hostile Work Environment Based on His Race**

49. William Leader who held senior management positions at Amazon's MDW8 fulfillment center from July 2018 to June 2020 and worked closely with Edmond believes Edmond was subjected to a discrimination.[3] Leader Decl. ¶ 4; See Exhibit 4, Leader Dep. 35:1-24; 114:3-15. According to Leader, in comparison to his White counterparts Edmond was always treated with more scrutiny and "the only thing different about Eugene, other than the fact that he had a degree, which other people didn't have, and he had a lot more work experience, is that he was African-American." Leader Dep. 35:1-24. He also testified "from my observations and just recounting and looking at things through what I experienced and when I was there, my opinion is yeah. I mean, the only thing I can explain is because Eugene is black, compared to everybody else being otherwise white or Hispanic, he was treated differently." Leader Dep. 35:1-24.

50. In addition, Leader personally observed that "Bradley Dietz, Mike Cassell and Alex Kanner scrutinized Edmond's performance at a much higher rate than his non-black counterparts." Leader Decl. ¶ 6. According to Leader, Edmond was subjected to different expectations and "had to -- he had to fight for -- for his equal standing" but was always second-guessed. See Exhibit 4, Leader Dep. 36:11 to 38:10.

51. Leader specifically identified other Area Managers who were treated better than Edmond.

a. Bobby Keller was "put on a plan." See Exhibit 4, Leader Dep. 76:10-20. By contrast Leader stated: "Why aren't we investing in Eugene? But we're going to invest in a – a guy that's out of the military that – that has his own personal demons, and no education? So, there's – and the difference is the color of skin." Leader Dep. 77:19 to 78:5.
b. Brandon Smith, another white Area Manager, who "never did anything but pick on a really easy shift. Again it's just – it was just this kind of stuff that didn't make sense." Leader Dep. 78:12-13.
c. Brad Dietz remained "in inbound, like, for almost the entire time I was there" and didn't move to outbound "until he had to."[4] Leader Dep. 72:4-7.

52. Leader also testified that Edmond and another African American employee were placed in a "bastarized shift" with "lack of structure, lack of supervision, lack of planning and no real support" which made them "the butt of everyone's jokes." See Exhibit 4, Leader Dep. 56:16 to 57:8. The way that Edmond and the other Black employee were treated "just left a bad taste in [Leader's] mouth. There's no way to say it other than that." Leader Dep. 37:23-24.

---

[3] The positions held by Leader included Area Manager (L5), interim operations manager, and L6 operations manager. See Exhibit 4, Leader Dep. 12:18-24; Exhibit 25, Leader Declaration ¶ 1.

[4] From Dietz own testimony we know that he only moved to outbound to "stretch" into his L6 promotion. See Additional Fact 64.

### ii. Edmond Was Placed in a Position to Fail Through Constant Reassignments and Lack of Support While Dietz took away resources

53. Moreover, Leader testified that Edmond was intentionally placed in a position to fail through frequent movements and reassignments. Leader Decl. ¶¶ 7to 13; See Exhibit 4, Leader Dep. 38:20 to 39:2; 43:12-21; 57:17 to 58:13; 69:22 to 71:10. According to Leader, when someone "keeps getting moved around," there is "no way to get into a rhythm and understand what you're doing" with respect to "the fluctuation of how we stow freight or how we received freight or how we picked freight or techniques, freight – dock design, rank design, rate expectations, staffing, understanding the staff, the training of each one of these individuals" See Exhibit 4, Leader Dep. 69:22 to 70:19. Leader concluded that "if you keep getting bounced around, you're always going to be at the rookie level. Right? There's no way to get better." *Id.*

54. During these moves Edmond was saddled with additional responsibilities that others in his position did not have. See Exhibit 12, Ptf. Dep. 41:13-22; 44:2-11. And, in February 2021 Dietz took away resources from Edmond. Specifically, Edmond testified that Dietz took away a Process Assistant away from him. Ptf. Dep. 64:7-16.

55. According to Leader, while Edmond was frequently moved between different assignments, "other folks, I noticed, tended to stay in the same row for long periods of time... and didn't seem to have the same expectation to -- to learn on the job so quick." See Exhibit 4, Leader Dep. 39:6-9; Exhibit 25, Leader Declaration ¶ 9. Jones testified that he "had not seen any other managers in MDW8 move from inbound, to outbound to inbound back to another position" and that he thought it was unfair that Edmond was moved to the most demanding operational area during peak. See Exhibit 5, Jones Dep. 169:8-23.

### iii. Edmond Complained to HR, HR Did Nothing, and the Discriminatory Treatment Intensified

56. Starting at the end of the Summer of 2020, Edmond had numerous conversations with Felicia O'Bryant, Human Resources Assistant where he complained about Brad Dietz's discriminatory treatment and comments. See Exhibit 12, Ptf. Dep. 58:22 to 60:1; 61:15 to 62:15. In November 25, 2020, Edmond had an additional conversation with O'Bryant where he told her that he "did not want to move, [he] did not want to work under [Dietz], did not believe that [he] would get the same type of training that was led to believe I would get" and that he did not believe that "[Dietz] would have his best interest to succeed in mind." Ptf. Dep. 58:20 to 59:3. In that same conversation, he told her that he "felt that in the past [Dietz] had said some things that were racist." Ptf. Dep. 59: 13-16.

57. Edmond also complained to Dietz' supervisor Michael Casale telling him that he did not want to work with Dietz because Dietz had in the past caused him to fail. Edmond also informed him of the discriminatory comments made by Dietz in the past. See Exhibit 12, Ptf. Dep. 54:3-20; 65:13 to 66:2.

58. While Amazon policy requires an investigation into all complaints of discrimination, the record contains no evidence that any of the complaints brought by Edmond were investigated. See Exhibit 15, Dr. Nielsen's expert report at. P. 11.

59. Despite Edmond's explicit complaints to O'Bryant and Casale, Amazon still required Edmond to work under Dietz's direct supervision. See Def. Stat. ¶ 78.

60. Once Dietz became Edmond's supervisor in December 2020, Edmond's discriminatory treatment continued and escalated, including additional movements to and from outbound while receiving next to no training, and having necessary resources removed from him by Dietz. See Edmond's Decl. at Exhibit 14; See Exhibit 10, Casale 63:15-19; 64:13-16. See Exhibit 12, Ptf. Dep. 53:10-18; 56:7-16; 57:2-23; 64:7-16; 67:20 to 68:4.

### C. Amazon Also Fails to Investigate Jones Complaint Against Copeland

61. During his time at Amazon, Quinton Jones complained to Felicia O'Bryant that Copeland was discriminating against him. See Exhibit 9, O'Bryant Dep. pp. 63:18 to 64:2.

62. Amazon did not investigate Jones's complaints. Copeland testified that she was never interviewed in relation to the complaints made by Jones against her and that she does not know if Amazon took any action or interviewed any other individual related to those complaints. See Exhibit 7, Copeland Dep. 58:10-20.

## III. Amazon's False Claims Concerning Edmond's Frequent Moves to Other Roles Creates an Issue of Fact

63. Throughout the course of this litigation Amazon has claimed that Edmonds moves to different assignments were necessary to provide Edmond with the training to "broaden his experience" for a "future promotion" to Level 6. See Exhibit 26, Amazon Position Statement at AMZN 451-458 at 454.

64. Dietz, who held the same position as Edmond and became his supervisor, admitted that he had no experience in outbound operations before being promoted to the very role Edmond was aiming for. See Exhibit 1 Dietz Dep. 58:11-22; 58:23-59:9. Dietz was stationed exclusively in inbound as both a Level 4 and Level 5 Area Manager and was not transferred to outbound while in the Area Manager position. *Id.* Only after being asked to "stretch" into and perform the L6 operations manager role did Dietz move to outbound for a two-month period prior to his official promotion, during which time he had the benefit of an established mentor relationship with Mike Casale, who provided guidance and support. See Exhibit 1, Dietz Dep. 59:12-60:8.

65. Michael Casale, who held the second-in-command Senior Operations Manager position at MDW8 and the very L6 role that Edmond sought to obtain, had no outbound experience at all. See Exhibit 1, Dietz Dep. 65:16-24. Casale testified that he held the L6 operations manager position continuously from September 2019 through September 2022. See Exhibit 10, Casale Dep. 13:19-24 to 14:1-22. Edmond was terminated in April 2021.

## IV. Amazon's Policies and Practices at MDW8 Are of the Type that Can Lead to Discrimination

66. Dr. Laura Beth Nielsen holds the prestigious Board of Lady Managers of the Columbian Exposition Chair Professor position in the Department of Sociology at Northwestern University and serves as a Research Professor at the American Bar Foundation. She earned both a Ph.D. in Jurisprudence and Social Policy and a J.D. from the University of California, Berkeley. See Exhibit 27, Doctor Nielsen's CV. Dr. Nielsen has over 25 years of specialized experience in employment discrimination research, organizational behavior, and civil rights law. See *Id.* Dr. Nielsen has authored or co-authored more than 25 peer-reviewed articles and 4 books focusing on discrimination and employment civil rights. See Id. She also led the team that drafted the American Sociological Association's amicus brief in the landmark Dukes vs. Wal-Mart case. See *Id.* and Exhibit 15.

67. Doctor Nielsen analyzed the record of the present case. She determined that Amazon's policies and practices in place at the time of Edmond's employment are of the type identified in the scientific literature as those where discrimination tends to thrive. See Exhibit 15, Nielsen's expert report.

68. Specifically, she concluded that Amazon's "segregated occupation categories, unclear and inconsistent application of policies in training, promotion, and anti-discrimination created the conditions in which racial discrimination and stereotypes is known by social scientists to thrive at both the conscious and unconscious levels." See Exhibit 15, Nielsen's expert report at p. 14. Dr. Nielsen also found that Amazon's investigation practices lacked clarity, consistency and procedural rigor. See Exhibit 15, Nielsen Report at pp. 9-12. She specifically concluded that Amazon's investigation practices concerning the handling of claims of discrimination and retaliation could have made MDW8 vulnerable to discrimination and retaliation. See Exhibit 15, Nielsen Report at pp. 11.

In Chicago, Illinois this 21st day of November 2025

**LÁZARO LAW GROUP, LLC**
Attorneys for Eugene Edmond
321 S. Plymouth Ct. Ste. 1250
Chicago, IL 60604
Tel. 312-461-9900
Fax. 312-858-6735



Rafael E. Lázaro
Pedro Giner
Joseph García
rlazaro@lazarolawgroup.com
Pginer@lazarolawgroup.com
Jgarcia@lazarolawgroup.com