**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EUGENE EDMOND, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-2735 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| AMAZON.COM SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Eugene Edmond lost his job at an Amazon fulfillment center after stealing a sandwich and a soda from the cafeteria. Video footage showed him scanning the items, but he made no attempt to pay for them. Instead, he simply walked off.

That incident wasn't the only problematic episode at the self-service kiosk, either. Before terminating him, Amazon confronted Edmond with security footage showing a separate incident. One month earlier, video showed Edmond taking a bag of chips and a soda from the cafeteria without paying for them. But Edmond believed that he did, in fact, pay for those items.

Edmond stole once, and maybe twice. So the company let him go. As the saying goes, there is no such thing as a free lunch. Edmond paid for it by getting fired.

Edmond doesn't buy Amazon's reason for firing him. He believes that, in practice, Amazon doesn't fire employees after they steal once or twice. Instead, he contends that Amazon follows an unwritten rule: the company fires employees only after they steal three times. Edmond cries foul because the company called him out before he had three strikes.

Edmond believes that Amazon terminated him and treated him more harshly because he is black. So Edmond sued Amazon and alleged race discrimination and a hostile work environment. After discovery, Amazon moved for summary judgment.

For the reasons stated below, Amazon's motion for summary judgment is granted.

## Background

### I.     Life at Amazon

Amazon operates fulfillment centers where employees store, package, and ship lord-knows-how-many goods destined for doorsteps from sea to shining sea. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 1 (Dckt. No. 140). Eugene Edmond started working at an Amazon fulfillment center in Illinois in September 2016. *Id*. at ¶ 2.

He began as an entry-level "Tier 1 associate." *Id*. at ¶ 66. Over the next four years, Amazon promoted Edmond three times, eventually making him a "Level 5 area manager." *Id*. Edmond basically managed other employees at the fulfillment center. *Id*. at ¶ 3.

As Napolean once said, an army marches on its stomach. And apparently, Amazon workers do too.

In the lunchroom, employees can buy food and drinks from a self-service kiosk. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 140). It operates like a mini grocery store self-checkout. The kiosk area has shelves and coolers stocked with food and beverages. *Id*. at ¶ 15. When employees pick out their items, they go through a self-service checkout area. *Id*.

At checkout, employees scan their items using a barcode scanner, make their payment, and can choose to get a receipt. *Id*. at ¶¶ 15–16. A third party, not Amazon, owns the kiosks. *Id*. at ¶ 14. But Amazon requires employees to pay for items that they take from the kiosk. *Id*. at ¶ 18.

If an employee's payment goes through, the payment terminal makes a confirmation sound, and the screen displays a message confirming the payment. *Id*. at ¶ 16.

But not all checkouts lead to success. If you've ever tried your luck at a self-service checkout, you know the feeling.

A transaction can fail for several reasons. For example, a transaction can fail if an employee cancels the transaction, or if the form of payment doesn't go through, or if the system times out because the employee took too long. *Id*. at ¶ 17.

Securitas, a third-party security firm, reviews cancelled transactions. *Id*. at ¶ 21. Securitas looks at security footage of the kiosk area to see whether an employee returned an item, or tried to pay for it again, or simply kept it after a transaction failed. *Id*. at ¶ 23.

When Securitas suspects that an employee took an item without paying, it records the non-payment. *Id*. at ¶ 24. If an employee fails to pay a second time, Securitas compiles the records from both incidents into a document called a "Market Report." *Id*. at ¶ 25. Then, Securitas sends the Market Report to Amazon's Loss Prevention team. *Id*.

Perry Smolinski served as Amazon's Regional Loss Prevention Manager during Edmond's time at the company. *Id*. at ¶ 20. Smolinski investigated Securitas's Market Reports, and often interviewed the employees. *Id*. at ¶ 28.

Leigh Copeland represented Amazon's Human Resources in kiosk theft investigations. *Id*. at ¶ 29. Smolinski and Copeland worked together to determine whether an employee violated Amazon's Standards of Conduct or any other policy. *Id*. at ¶ 28.

Amazon requires employees to follow the Company's Standards of Conduct, which are company policies found in its "Owner's Manual and Guide to Employment." *Id.* at ¶ 8.

Needless to say, Amazon doesn't look favorably on employee theft. The Standards of Conduct include theft as an infraction that can lead to "termination of employment." *Id*. at ¶ 12.

According to Edmond, Amazon's practice isn't quite as simple as steal-and-you're-fired. Edmond argues that Amazon normally followed an informal "three strikes" practice. That is, the company fired an employee only after three incidents of kiosk theft. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 1–3, 5 (Dckt. No. 144).[1] The three-strikes practice ensured that an employee actually stole before Amazon fired them, since the kiosk system could make a mistake. *Id*. at ¶ 3; Ex. 4, Leader Dep., at 49:4-17 (Dckt. No. 139-5).

Amazon disagrees. The Standards of Conduct say that an employee can be fired for one instance of theft. *Id*. at ¶ 13. According to Amazon, in practice, they investigate employees for kiosk theft only after two suspected non-payments. *Id*. at ¶ 30. But there are no freebies.

## II. Edmond's Termination

Edmond typically bought food or drinks from the kiosk two to four times a week. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 140).

Edmond had the munchies on March 3, 2021. So he went to the cafeteria and grabbed a 12 oz. Cherry Bubly drink and a bag of Lay's Cheddar Jalapeno chips. *Id*. at ¶ 36.

He scanned the items and put his credit card into the payment terminal. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 144). The parties disagree about whether the transaction successfully went through.

---

[1] Amazon argues that some of the facts Edmond offers about the three-strikes policy are based on inadmissible hearsay. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 1–5 (Dckt. No. 144). The Court agrees that some of the testimony is inadmissible. *See* Ex. 1, Dietz Dep., at 86:2-18 (Dckt. No. 139-2) ("I believe I was told [Amazon had] a three-strike policy."). But some witnesses' testimony about the three-strikes policy did not rely on hearsay. *See* Ex. 2, Flores Dep., at 45:7 – 46:2 (Dckt. No. 139-3) (saying that he knew about the three-strikes policy because it was "the Amazon standard for their investigations"); Ex. 4, Leader Dep., at 48:11 – 49:6, 87:15 – 88:24 (Dckt. No. 139-5).

According to Edmond, he heard the normal sound the machine makes when a transaction goes through, and he believed he paid for the items. *Id*. But in Amazon's view, the transaction failed, and the kiosk recorded a cancelled transaction. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 140). Either way, Edmond left with the food and drink, and snacked away. *Id*. at ¶ 36.

A few weeks later, on April 11, 2021, he went back to the cafeteria. *Id*. at ¶ 37. This time, Edmond snagged a 20 oz. Diet Dr. Pepper and a Salisbury Steak sandwich. *Id*. Edmond scanned the items, but unlike his March visit, he made no attempt to pay. *Id*. So the kiosk timed out and cancelled the transaction. *Id*.

Edmond doesn't deny that he walked away from the April transaction without paying. Instead, he only "denies that he violated the rule concerning food kiosk violations." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (Dckt. No. 140) (citing Pl.'s Statement of Additional Facts, at ¶¶ 1–10 (Dckt. No. 138)).

That sentence (meaning the reference to "the rule" about "violations") isn't crystal clear. But the citation helps to clear things up. Plaintiff cited paragraphs one to ten of his Statement of Additional Facts, which addressed Amazon's three-strikes policy. They didn't call into question whether Edmond stole a sandwich and a soda in April.

In other words, Edmond doesn't deny committing theft in April. He simply believes that one act of theft is not a basis for termination, given that Amazon follows a three-strikes rule. *See* Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 138) (stating that Amazon "substantiated only one incident of alleged kiosk theft: the April 11, 2021 transaction"); *id*. at ¶ 9 ("Amazon employees testified that they would not be in agreement with a termination for a single violation of the food kiosk rule.").

After the March and April cancelled transactions, James Pope, a Securitas employee, prepared a Market Report and sent it to Amazon. *Id*. at ¶¶ 35, 39. Smolinski received the Market Report and started investigating Edmond for theft. *Id*. at ¶ 39.

Smolinski and Copeland interviewed Edmond about the two cancelled transactions. *Id*. at ¶ 40. During the interview, Edmond couldn't recall taking items without paying, but he didn't deny that security footage showed him taking items without paying. *Id*. at ¶ 41.

Either way, the interview didn't go well for Edmond. When the interview ended, Amazon suspended Edmond pending further investigation. *Id*. at ¶ 42.

The parties spill a lot of ink debating who made the decision to terminate Edmond, and how well Amazon carried out the investigation. But suffice it to say that Amazon decided to terminate Edmond on April 30, 2021. *Id*. at ¶ 45. Amazon says that it fired Edmond for theft in violation of its Standards of Conduct. *Id*.

Edmond thinks that the reason is pretextual. He believes that Amazon fired him because he is black – or at least, that his race was a motivating factor. *Id*. at ¶ 45; *see* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 33–41 (Dckt. No. 144).

### III.    Comparators

The parties disagree about whether Amazon found that Edmond stole twice, or only once. According to Edmond, Amazon concluded that only his April transaction counted as theft. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 144). In Edmond's view, a solitary act of theft wouldn't violate Amazon's policies and create a basis for termination because it has a three-strikes practice. *Id.* at ¶¶ 6–10.

Edmond contends that Amazon treated non-black employees differently, and wouldn't fire them after finding only one instance of kiosk theft. *Id.* at ¶ 34. To prove the point, he offers evidence about two white employees: Andrew Stone and Jonathan Lidsky.

Edmond argues that Amazon didn't fire a white employee named Andrew Stone after he stole from the kiosk. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 61 (Dckt. No. 140). But he largely relies on inadmissible hearsay.[2]

The only admissible evidence about Stone comes from Bradley Dietz, an Amazon employee who met with Stone to discuss his kiosk activity. *Id.* at ¶ 35. Dietz worked in a supervisory role at Amazon, and served as Edmond's supervisor. *Id.* at ¶ 78.

Even so, Dietz had only limited personal knowledge about Stone. Dietz didn't serve as an investigator in Stone's case, and he doesn't know who investigated Stone. *See* Ex. 1, Dietz Dep., at 91:3-10 (Dckt. No. 139-2).

Dietz only knew that Amazon investigated Stone for kiosk theft, and that Dietz had been tasked with asking Stone about it in an informal "Seek to Understand" meeting. *Id.* at 89:15 – 90:23. During the meeting, Stone said that he realized that he forgot his wallet or phone at the kiosk, but he went back to pay for the items later. *Id.* at 91:12-17.

Dietz didn't review documents or videos for Stone. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 35 (Dckt. No. 144). Dietz also didn't testify about whether Amazon fired Stone, and he didn't know whether Amazon found evidence that Stone paid for the items. *See* Ex. 1, Dietz Dep., at 91:18-22 (Dckt. No. 139-2).

---

[2] Edmond offers testimony from himself and other witnesses that Amazon didn't fire Stone for one instance of theft. But the testimony Edmond offers is inadmissible hearsay. *See, e.g.*, Ex. 12, Edmond Dep., at 110:19-21 (Dckt. No. 139-13) ("How did you learn about Mr. Stone taking items from the kiosk? [Edmond]: That one person that told me was Robert Keller."); Ex. 4, Leader Dep., at 89:12-22 (Dckt. No. 139-5) ("I heard of – plenty of folks had con- – had counselings or conversations. . . . I think Andrew Stone might have been one of them."); Ex. 9, O'Bryant Dep., at 81:7 – 82:5 (Dckt. No. 139-10).

Edmond also claims that Jonathan Lidsky, another white employee, stole from the kiosk without getting fired. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 35 (Dckt. No. 144). Edmond relies on testimony from Quinton Jones, a now-deceased Amazon human resources employee. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 63 (Dckt. No. 140).

Jones testified that he learned about Lidsky from Mike Nowalski, a multi-state loss prevention supervisor at Amazon. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 38 (Dckt. No. 144). So Edmond offers testimony about Lindsky from Jones, who heard about it from Nowalski.[3]

Jones testified that Jonathan Lidsky, a white area manager at Amazon, was on his "second strike," but Amazon didn't fire Lidsky. *See* Ex. 5, Jones Dep., at 208:12-20 (Dckt. No. 139-6); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 38 (Dckt. No. 144).

Amazon offers two comparators of its own, Shahid Missri and Adam Waldera. Shahid Missri is Asian, and Adam Waldera is white. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 47 (Dckt. No. 140).

Both Missri and Waldera worked as Amazon employees. *Id.* They were the only other employees that Smolinski and Copeland investigated, and that Amazon fired for kiosk theft during Edmond's time at Amazon. *Id*.

---

[3] While Amazon argues that the testimony is hearsay, the Court finds that the testimony is not hearsay under Federal Rule of Evidence 801(d)(2)(D). Nowalski oversees loss prevention at multiple Amazon sites, and allegedly made the remark about Lidsky's kiosk theft within the scope of that role. *See* Ex. 5, Jones Dep., at 208:12-20 (Dckt. No. 139-6); Ex. 8, Smolinski Dep., at 34:16 – 35:13 (Dckt. No. 139-9); *see also Stepp v. Convance Cent. Lab'y Services, Inc.*, 931 F.3d 632, 636, n. † (7th Cir. 2019) (finding that a statement fell under 801(d)(2)(D), because the speaker was authorized "to interview workers, [and] so the scope of her agency included speaking about personnel decisions").

Smolinski began investigating Missri after receiving a Market Report indicating two cancelled transactions. *Id.* at ¶ 49. But before he could interview Missri, Smolinski learned that Missri had a third cancelled transaction at the kiosk. *Id.* at ¶ 52.

So, Smolinski interviewed Missri, alongside an Amazon Human Resources Representative, about all three transactions. *Id.* The parties dispute what the investigation found.

Smolinski testified that he concluded that Missri committed theft on two occasions. *Id.* at ¶ 54; Ex. C, Smolinski Decl., at ¶ 28 (Dckt. No. 133-4). But Edmond points out that notes from the investigation suggest Missri failed to pay for items on three occasions. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 54 (Dckt. No. 144); Ex. 31, Missri Investigation Notes, at 4 (Dckt. No. 139-32).

Either way, Amazon terminated Missri's employment. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 55 (Dckt. No. 140).

Amazon also points to a second employee, Adam Waldera, as a comparator. Smolinski also received Adam Waldera's Market Report. *Id.* at ¶ 56; Ex. C, Smolinski Decl., at ¶ 30 (Dckt. No. 133-4). Waldera's Market Report cited four incidents of potential non-payment. *Id.* So, Smolinski began investigating Waldera.

Smolinski interviewed Waldera alongside Felicia O'Bryant, who worked in Amazon's Human Resources Department. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 58 (Dckt. No. 140); Ex. C-5, Smolinski Decl., at Ex. E (Dckt. No. 133-4).

During the interview, Waldera provided a credit card statement showing that he had actually paid for the items for two of the cancelled transactions. *See* Pl.'s Resp. to Def.'s

9

Statement of Facts, at ¶ 58 (Dckt. No. 140). [4] So, Amazon determined that Waldera stole on two occasions. *Id*. at ¶ 59.[5]

The parties disagree about Copeland's level of involvement in reviewing the Waldera incident. Amazon says that Copeland fired Waldera, but Edmond thinks that she merely reviewed the case, and didn't make the final decision. *Id*. at ¶ 60.

Whatever her involvement, Amazon decided to terminate Waldera's employment because of theft. *Id*.

## IV. Copeland

Copeland's involvement is important because, in Edmond's view, Copeland was a racially biased decisionmaker. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 25–32 (Dckt. No. 144). Edmond calls attention to a few facts.

First, Copeland is white, and she made the decision to terminate Edmond and another black employee named Quinton Jones. *Id.* at ¶¶ 25, 29. The parties disagree about whether Copeland was thorough and accurate in her investigation into Jones. *Id.* at ¶¶ 29–31. Edmond thinks that Copeland wrongly accused Jones of not working while on the job, and didn't properly investigate whether he had actually worked. *Id*.

---

[4] Amazon offers these findings from an investigation report Smolinski authored, rather than his own testimony. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 58 (Dckt. No. 144); Ex. C-5, Smolinski Decl., Ex. E, 24 of 32 (Dckt. No. 133-4). The Court finds that its contents are not offered for their truth (*i.e.*, that Waldera stole, or didn't steal), but to show the number of times that Amazon believed Waldera stole. So, despite Edmond's objections, it is not hearsay.

[5] Edmond argues that Amazon fired Waldera for stealing on four occasions, since Waldera's investigation report refers to four video instances of kiosk theft. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 59 (Dckt. No. 144); Ex. 34, Waldera Investigation Report, at 2 of 2 (Dckt. No. 139-35). But Edmond's version of the document leaves out the interview findings, which state that "Waldera was able to show proof of payment for transactions on 2/12, [and] 2/13." *See* Ex. C-5, Smolinski Decl., Ex. E, at 29 of 32 (Dckt. No. 133-4).

Second, Edmond thinks that Copeland answered questions during her deposition in a way that shows racial bias. *Id.* at ¶ 26. Copeland said that race could be considered in an employment decision "when there is a race that is not being equally allocated in a job," apparently meaning that the group is underrepresented. *See* Ex. 7, Copeland Dep., at 77:1-10 (Dckt. No. 139-8) ("If we have an underrepresented race or ethnicity we need to definitely look at that.").

When asked if calling a black employee "ghetto" would violate Amazon's policies, Copeland answered that she "would need to know the context . . . need to know the situation in order to make any type of determination." *Id*. at 89:18 – 90:18.

Edmond's lawyers posed more questions to Copeland. They asked if "calling a black employee poor, hungry, and driven" violated Amazon's policies. *Id*. at 91:14-16. Copeland responded that calling "any employee that or stating that about any employee is not a good practice," and when pressed, said she would "need more information in order to make a determination." *Id*. at 91:19 – 92:14.

When asked if displaying a Confederate flag would violate Amazon's discrimination and harassment policies, Copeland said, "I think it's just really in poor taste to have it there, but I don't know in and of itself that is necessarily being discriminatory." *Id*. at 93:1-9.

In Edmond's view, Copeland's responses are discriminatory and demonstrate that she is a racially biased decisionmaker. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 25–32 (Dckt. No. 144).

The parties also dispute whether Quinton Jones made a race discrimination complaint against Copeland at Amazon. *Id*. at ¶ 27.[6] Felicia O'Bryant recalled that Quinton Jones

---

[6] Edmond alleges that Copeland was the subject of three complaints, which he claims to attach to his statement of facts, but he fails to lay the proper foundation for the documents themselves. *See* Def.'s

11

complained to her about race discrimination by Copeland. *Id*. But O'Bryant testified that she didn't view it as a "complaint," but as "venting." *Id*.

The parties agree that an Amazon Human Resources employee, Teri Truelove, filed a complaint to the Amazon Ethics line against Copeland. *Id*. But that complaint did not allege race discrimination. *Id*.

## V.     Hostile Work Environment

Edmond also claims that Amazon tolerated an atmosphere of hostility toward black employees. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 42–68 (Dckt. No. 144).

Edmond offered testimony from Dr. Laura Nielsen, an employment discrimination expert who analyzed the policies, practices, and characteristics of the Amazon facility that employed Edmond. *Id*. at ¶¶ 42, 66; Ex. 15, Nielsen Report, at 2 of 38 (Dckt. No. 139-16).

She observed that Edmond's fulfillment center reported three African-American employees ranked above "the operative level" in 2019. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 42 (Dckt. No. 144). In 2021, four African-American employees ranked above the operative level, while 23 white employees held those positions. *Id*.

Dr. Nielsen concluded that the facility's characteristics indicated a "persistently racially segregated workforce." *Id*. In her "summary of findings," Dr. Nielsen concluded that Amazon's policies and practices during Edmond's employment "reflect characteristics found in organizations where discrimination, harassment, and retaliation are prevalent." *See* Ex. 15, Nielsen Report, at 3 of 38 (Dckt. No. 139-16).

---

Resp. to Pl.'s Statement of Additional Facts, at ¶ 27 (Dckt. No. 144). Besides Jones's alleged complaint, Edmond refers to two other complaints against Copeland. *Id*. Notably, those complaints were not for race discrimination. *Id*.

She also opined that Amazon's policies and practices "are of the type identified in the scientific literature as those where discrimination tends to thrive." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 67 (Dckt. No. 144).

Edmond believed that Amazon tolerated a discriminatory atmosphere in the workplace. Edmond testified that dock managers had "White Lives Matter" paraphernalia on their lunch boxes. *Id*. at ¶ 43. He also saw a maintenance worker who would carry a coffee mug with a Confederate flag on it. *Id*.; Ex. 12, Edmond Dep., at 151:4-9 (Dckt. No. 139-13). Those employees never faced disciplinary action, but Edmond thinks that they should have been disciplined. *See* Ex. 12, Edmond Dep., at 151:10-11 (Dckt. No. 139-13).

Edmond also recalled issues during his initial interview at Amazon. The interviewer didn't ask him about his qualifications. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 44 (Dckt. No. 144). The interviewer only asked Edmond questions about football and asked Edmond whether he liked rap music. *Id*.

Even so, he got the job. And then, he got promotions.

That interviewer later became one of Edmond's direct managers. *Id*. As a manager, he repeatedly misidentified Edmond with another black employee named Burt, saying that they looked alike. *Id*. The manager called Edmond and Burt, "Bert and Ernie from Sesame Street." *Id*. He also told Edmond at one point that "all black folks are lazy." *Id*.

Other employees caused issues, too. Brad Dietz, before he became Edmond's supervisor, once asked Edmond if he ever had a Jheri curl and whether he'd be willing to "bring one back." *Id*. at ¶ 45. Around the time of the George Floyd protests, Dietz also made comments comparing the protestors to "the thugs who worked at" the Amazon fulfillment center. *Id*. Edmond also remembered Dietz remarking that "the protests in Chicago were based on the protesters

13

arranging to get free loot." *See* Ex. 12, Edmond Dep., at 60:16-22 (Dckt. No. 139-13); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 45 (Dckt. No. 144).

Quinton Jones also heard Dietz's comment about protestors. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 46 (Dckt. No. 144). Jones heard Dietz make other comments as well. Dietz called an employee "ghetto." *Id*. at ¶ 46. Discussing a black employee's potential for promotion, Dietz remarked that the employee had a "PHD," which Dietz defined as "poor, hungry, and driven." *Id*.

According to both Edmond and William Leader, an Operation's Manager at the facility, Dietz also tried to make Edmond fail at his job. *Id*. at ¶¶ 33, 47. Dietz would give freight to Edmond that was time-consuming to prepare, meaning Edmond couldn't work in a timely fashion. *Id*. at ¶ 47; Ex. 12, Edmond Dep., at 55:5-20 (Dckt. No. 139-13).

Dietz also left out freight during his shift for Edmond to handle during a later shift. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 47 (Dckt. No. 144); Ex. 12, Edmond Dep., at 55:5-20 (Dckt. No. 139-13); Ex. 4, Leader Dep., at 45:5-20 (Dckt. No. 139-5).

According to Leader, Edmond and another black employee received worse shifts, and no real support, and "were kind of made to be . . . the butt of everyone's jokes." *See* Ex. 4, Leader Dep., at 57:1-8 (Dckt. No. 139-5).

Leader thought Edmond was scrutinized and "had a little bit of a harder row to hoe" than white employees at the facility. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 49–51 (Dckt. No. 144); Ex. 4, Leader Dep., at 35:9-24 (Dckt. No. 139-5). And Amazon more frequently moved Edmond between assignments, including to the most demanding areas. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 55 (Dckt. No. 144).

14

In response, Amazon says that area managers are moved to different assignments for training purposes, and that it also transferred other, non-black area managers to demanding areas. *Id*. at ¶ 63; Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 74–75 (Dckt. No. 140).

## VI.    Procedural History

Edmond later sued Amazon, bringing claims under Title VII of the Civil Rights Act, the Illinois Human Rights Act, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.[7] *Id*. at ¶¶ 81–101.

Some claims have fallen by the wayside in the meantime. Edmond voluntarily dismissed his failure-to-promote claims, and his retaliation claims. *See* Stipulation (Dckt. No. 127); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 140). But a few claims remain.

Edmond continues to allege race discrimination under Title VII, Section 1981, and the Illinois Human Rights Act. Edmond alleges that Amazon fired him because he is black, and alleges a hostile work environment.

After discovery, Amazon moved for summary judgment.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[7] The administrator of the estate of Quinton Jones joined the lawsuit. But the estate and Amazon settled. *See* Stipulation of Dismissal (Dckt. No. 105); 5/29/25 Order (Dckt. No. 106).

To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Edmond brings claims under Title VII, Section 1981, and the Illinois Human Rights Act. He alleges that he suffered from race-based discrimination and a hostile work environment.

Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1).

Section 1981 ensures that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws." *See* 42 U.S.C. § 1981.

And the Illinois Human Rights Act "makes it a civil rights violation for any employer to discriminate against an employee." *See Gamble v. Cnty. of Cook*, 106 F.4th 622, 625 (7th Cir. 2024) (citing 775 ILCS 5/1-101 *et seq.*).

16

"The same legal standard applies to claims of racial discrimination under Title VII, Section[] 1981 . . . and the IHRA." *Id.* The claims rise or fall together, so the Court will consider them as a group.

## I. Race Discrimination

Edmond claims that Amazon fired him because he's black. For a race discrimination claim to survive summary judgment, a plaintiff has two possible routes.

A plaintiff can "establish a dispute of material fact under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *See Gamble*, 106 F.4th at 625–26. Under *McDonnell Douglas*, a plaintiff has the initial burden "to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *See Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022).

Alternatively, a plaintiff can "more generally present enough evidence from which a reasonable jury could find that Defendants discriminated" against him because he's black. *See Gamble*, 106 F.4th at 626. That's the totality-of-the-circumstances approach that the Seventh Circuit explained in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

Edmond primarily invokes the *Ortiz* approach. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 3 (Dckt. No. 137). But he also refers to *McDonnel Douglas* and makes arguments under its burden-shifting framework. *Id*. at 16 n.18.

The two routes end up at the same place. *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) ("Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are merely convenient ways to organize our thoughts."). And "*McDonnell Douglas* is entirely consistent with our holding in *Ortiz,* and it

17

remains an efficient way to organize, present, and assess evidence in discrimination cases."
*Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 (7th Cir. 2025) (cleaned up).

So, the Court will use *McDonnell Douglas* to organize the issues. But ultimately the Court will consider the evidence as a whole, consistent with *Ortiz*.

In the end, "the only question that matters" is "whether a reasonable fact-finder could conclude that a plaintiff suffered the adverse employment action because of her membership in a protected class." *See Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025).

### A. Prima Facie Case

Under *McDonnell Douglas*, a plaintiff must present a prima facie case of discrimination. To make a prima facie case, Edmond must offer evidence that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *See Kuttner v. Zarumba*, 819 F.3d 970, 976 (7th Cir. 2016).

Edmond satisfied the first and third elements. Edmond is black, and race is a protected category. And termination is an adverse employment action. *See Revies v. Illinois State Police*, 29 F.4th 887, 894 (7th Cir. 2022).

But Edmond fails to satisfy the second element. Edmond cannot show that he met his employer's legitimate job expectations. After all, he stole while he was on the job.

The parties disagree about a lot of things. But one important fact sticks out: Edmond stole at least once. Edmond took food and drink, and didn't pay for them.

The parties debate whether Edmond stole once or twice. Edmond believes that he did, in fact, pay for the purchase in March.

18

But the incident in April is a different story. Amazon found that Edmond didn't pay for his soda and his sandwich. Edmond doesn't reject that finding, and nothing in the record suggests that it was a mistake or a misunderstanding.

Instead, Edmond argues that stealing from the company only once does not violate Amazon's policies. He points out that Amazon would not investigate theft until an employee has stolen at least twice. And in his view, Amazon doesn't fire employee until they steal at least three times. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 6–7 (Dckt. No. 137).[8]

That's a different issue. The question is whether a single act of stealing is against company policy. It is. The fact that it typically takes two thefts to trigger an investigation does not mean that stealing once is A-OK.

Edmond points to Amazon's unwritten three-strikes policy. Edmond thinks that, in practice, Amazon does not fire employees unless they steal from the company three times.

But the consequences of violating a policy aren't the same thing as whether an employee complied with the policy in the first place. The question here is whether Edmond complied with company policy and met its expectations when he stole. He didn't.

Amazon's practices when it comes to discipline does not change a simple reality: Amazon does not allow its employees to steal. Not even once.

---

[8] Amazon's reason for firing Edmond also serves as the reason he failed to meet legitimate performance expectations. So, the inquiry shifts to whether that reason is pretextual. *See Jones v. Ill. State Toll Highway Auth.*, 502 F. App'x 587, 591 (7th Cir. 2013) (explaining that when an employer's "proffered reason for firing [the employee] is also the basis for its conclusion that she was not meeting expectations, the question whether her performance was satisfactory merges with the inquiry into whether the stated reason was pretextual"). Edmond agrees. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 16 n.18 (Dckt. No. 137). The Court discusses pretext later, but addresses whether Edmond met legitimate jobs expectations for clarity.

An employee who stole, even once, violated Amazon's policies. So, an employee who stole, even once, didn't meet Amazon's legitimate employment expectations. That means Edmond fails under the second *McDonnell Douglas* element.[9]

Edmond does not satisfy the fourth element under the *McDonnell Douglas* framework, either. Edmond didn't show that similarly situated employees outside of his race received more favorable treatment.

A plaintiff "must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Edmond offers two comparators: Andrew Stone and Jonathan Lidskey. The evidence about those two employees is too thin of a reed to support a claim.

The evidence about Stone doesn't lend much of a hand. Edmond offers testimony from Dietz, who interviewed Stone in an informal "Seek to Understand" meeting. Dietz testified that he asked Stone about an instance of non-payment. Stone responded that he forgot his wallet and went back to pay for the items.

---

[9] The *McDonnell Douglas* framework seems like an awkward fit when a case involves a violation of company policy, followed by discipline that is disproportionately harsh. An employee does not meet legitimate job expectations when he or she violates company policy. In that situation, that employee will hit the end of the road under the second element of the *McDonnell Douglas* test. But it seems conceivable that a plaintiff could bring a claim about disproportionately harsh, race-based discipline, even if the employee did violate company policy. Imagine, for example, firing a black employee for doing a bad parking job in the company parking lot. Maybe that's another example of when an *Ortiz*-based analysis could add value. In any event, Edmond did not show comparators (meaning the fourth element of a prima facie case), and he didn't show pretext, either. So he has no claim.

That's it. Edmond doesn't offer evidence to fill in the gaps. The record does not reveal whether Amazon concluded that Stone stole. At best, the record shows that Amazon raised a question.

Comparators shed light if they "engaged in similar conduct." *See Coleman*, 667 F.3d at 847. But the information about Stone is too sketchy to add any value.

The facts don't reveal whether Amazon ever found that Stone ultimately paid for the items. That's a possibility – after all, Amazon found that Adam Waldera (another employee) did, in fact, pay for some of the questionable transactions. *See Eaton v. Indiana Dept. of Corrections*, 657 F.3d 551, 558 (7th Cir. 2011) ("[W]e rejected a potential comparator who has the same supervisor and was subject to the same standards as the plaintiff because there was no evidence that the comparator had additional conduct violations.").

Importantly, the record does not reveal whether Stone did, in fact, return to the kiosk and pay for the items (as he claimed). It is unknown whether Amazon found a violation, or fired him, or took any other disciplinary action against him. Edmond didn't depose Stone, so potential questions went unanswered.

The situation with Stone involved other differences, too. Nothing in the record suggests that Amazon had video of Stone committing theft, like it did for Edmond. And nothing in the record suggests that Smolinski and Copeland – the managers who investigated Edmond – investigated Stone, too.

The need for similarity makes sense in this context. After all, not all failures to pay are created equal.

An employee could neglect to pay for all sorts of reasons. For example, imagine if an employee inserted a credit card, but the payment didn't go through for some reason. And then,

21

imagine if the employee left the kiosk with the genuine, honest belief that he did, in fact, pay for the items.

That's a non-payment. But it's different than what Edmond did in April. Edmond didn't even *attempt* to pay.

The granular details matter. And without knowing more specifics, it is difficult to conclude that another employee who failed to pay is in the same boat as Edmond.

The evidence about the other potential comparator, Jonathan Lidsky, doesn't fare much better. Edmond did offer testimony that Lidsky was on his second strike, and that Amazon did not fire Lidsky.

But no one deposed Lidsky. The information about Lidsky came from Jones, who testified about what he heard from Mike Nowalski.

Even if that chain of testimony isn't hearsay (because it falls within the scope of agency under Rule 801(d)(2)(D)), there isn't much to go on. The record doesn't reveal what information Amazon had about Lidsky. The record does not include any details about what Lidsky stole, or what Amazon found, or who investigated Lidsky, or anything else. That's too little to support a finding by a reasonable jury that Lidsky and Edmond were similarly situated.

In all, Edmond fails to show that he met Amazon's legitimate employment expectations or that Amazon treated him differently than similarly situated individuals outside of his race.

### B. Legitimate Justification

Edmond did not present enough evidence to support a prima facie case. But even if he had satisfied his initial burden, he wouldn't be home free. The burden would shift to Amazon to present evidence of a legitimate, non-discriminatory justification for its actions. *See Mitchell*, 143 F.4th at 809. This "is a light burden." *Id.*

22

The record establishes that Amazon had a legitimate reason to give Edmond the boot. After all, the company found that he committed theft.

### C.    Pretext

Amazon satisfied its burden, so the burden flips back to Edmond to present evidence of pretext. *See Dunlevy*, 52 F.4th at 353.

"Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025). A plaintiff must show that the employer's stated reason "was not the honest reason for the employer's" decision to fire them. *See Paterakos*, 147 F.4th at 797. In other words, Edmond must show that Amazon "did not honestly believe [its] reasons for terminating" him. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507 (7th Cir. 2014).

"Pretext can be proven, among other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of ambiguous or suggestive comments or conduct; or (3) of better treatment of people similarly situated but for the protected characteristic." *Paterakos*, 147 F.4th at 797.

Edmond argues that Amazon's reason is pretextual because it didn't fire similarly situated employees who were not black. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 15–17 (Dckt. No. 137). Edmond contends that the facts, viewed in the light most favorable to him, show that he "committed only one violation." *Id*. And Amazon applied a more generous three-strikes policy to non-black employees. *Id*.

But again, Edmond has not offered admissible evidence showing that similarly situated employees received better treatment. Plus, the record includes evidence that Amazon fired Adam Waldera, a white employee who stole twice.

23

Edmond agrees that Amazon found that he stole at least once. There isn't any evidence that Amazon relied on any reason other than theft when it let Edmond go.

In sum, the record lacks evidence of pretext. "Pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason given by an employer for an adverse employment action." *Downing v. Abbott Laboratories*, 48 F.4th 793, 804–05 (7th Cir. 2022) (internal quotation marks and citations omitted).

### D. Biased Decisionmaker

Edmond also argues that a jury could find that Copeland was biased towards black employees. As Edmond sees things, a jury could infer discrimination because Copeland harbored racist views. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 9–10 (Dckt. No. 137).

Based on this record, no reasonable jury could conclude that Copeland was racially biased, and decided to terminate Edmond based on his race.

Edmond relies on a series of hypothetical questions that counsel lobbed at Copeland at deposition. Sometimes hypothetical questions can help get to the bottom of things. But all too often, they don't add a lot of value. That's especially true when the questions get aimed at fact witnesses.

Counsel tried to elicit Copeland's views by asking about other alleged conduct in the record, meaning conduct by other people. Counsel asked about calling a black employee "ghetto," or calling a black employee "poor, hungry, and driven," or displaying a confederate flag on a coffee mug, and so on.

Copeland didn't do any of those things. She was asked to give her commentary and her reaction to the actions of others.

24

Copeland arrived at deposition to answer questions about the facts of the case. Based on the Court's review of the questions and the answers, Copeland did her level best to answer the hypotheticals thrown at her. She often answered that she would need more information, and would need to think it over. That's not much of a basis to conclude that someone is a racist, let alone that she made a personnel decision based on race.

\* \* \*

Looking at the evidence as a whole, in a light favorable to Edmond as the non-movant, Edmond has come up short. Edmond has not provided sufficient evidence to allow a reasonable jury to conclude that Amazon fired him based on his race. The Court grants summary judgment to Amazon on the discrimination claims.

## II.     Hostile Work Environment

Edmond also brings a hostile work environment claim.

A hostile work environment can constitute discrimination. An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023).

To prove a claim, a plaintiff "must show that '(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability.'" *See Beal v. Pac. Rail Servs., Inc.*, 647 F. Supp. 3d 636, 640 (N.D. Ill. 2022) (quoting *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019)).

Harassing conduct must have a "racial character or purpose." *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). A plaintiff must "present sufficient evidence to permit a reasonable jury to find that the alleged harassment was based on his race." *See Abrego v. Wilkie*, 907 F.3d 1004, 1016 (7th Cir. 2018).

The Court also must be "mindful that the 'standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.'" *See Jones v. Das*, 164 F.4th 1024, 1033 (7th Cir. 2026) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

A number of factors come into play when assessing whether an environment is hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Hambrick*, 79 F.4th at 842–43.

It also matters whether a plaintiff personally experienced hostility or simply heard about it. For example, "[r]acial epithets need not be stated directly to a plaintiff to be actionable, but remarks that are stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand." *See Jones*, 164 F.4th at 1036 (cleaned up).

Here, Edmond alleges that he personally experienced hostilities based on his race. He says that his interviewer only asked him questions about football and whether he liked rap music.

Those comments are not especially severe, threatening, or humiliating. Viewing the facts in a light favorable to Edmond, his interviewer assumed that he liked football and rap music because he is black. Even so, Edmond got the job. He then got promoted, several times.

His manager also confused him with another black employee named Burt, and called them Bert and Ernie. That's not a particularly potent comparison. At worst, the manager

misidentified employees of the same race, and paired them up in his mind. But it's hard to see a lot of hostility in comparing anyone to Bert and Ernie, one of the most likeable duos of all time (who, as an aside, don't look alike).

The manager also commented to Edmond that "all black folks are lazy." *Id*. That's a slur, for sure. But based on the record, the slur was a one-off. It wasn't directed at Edmond in particular, either. That is, the manager didn't tell Edmond that he is lazy, or that he is lazy because he is black, or anything alone those lines.

Edmond also alleges that Brad Dietz, before he served as Edmond's supervisor, made negative comments about Black Lives Matter protestors, and asked Edmond about having a Jheri curl.

Other comments and conduct were not directed at Edmond at all. Edmond recalled seeing White Lives Matter paraphernalia on lunch boxes, and saw a worker with a coffee mug that displayed a Confederate flag.

Outside of Edmond's presence, Quinton Jones heard Dietz call an employee "ghetto," and describe a black employee as "poor, hungry, and driven."

To successfully bring a hostile work environment claim, Edmond must show that these encounters are so severe *or* pervasive that "they amount to discriminatory changes in the terms and conditions of employment." *See Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (internal citation omitted).

For example, the Seventh Circuit held that "at least eighteen sexist or sexual comments in less than a year's time . . . was pervasive enough to create a hostile work environment." *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007); *cf. Patt v. Family Health*

27

*Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight gender-based comments made over several years were not sufficiently pervasive).

Edmond identifies comments made in his presence, and conduct that he personally observed. But they took place over his four years at Amazon – from questions about football during his interview, to comments about the Black Lives Matter protests years later.

That's not sufficiently pervasive to alter the terms and conditions of his employment. At most, they amount to a few comments during any given year of his employment.

And the comments and conduct are nowhere near the level of severity needed to establish a hostile work environment claim. *See Nichols v. Michigan City Plant Plan. Dep't.*, 755 F.3d 594, 601 (7th Cir. 2014) (holding that six incidents of harassment, including being called the n-word, did not amount to sufficiently severe or pervasive harassment); *Ellis*, 650 F.3d at 648 (finding that "an employee wearing clothing marked by the confederate flag" and comments to plaintiff that another individual's "name was 'black ass coal' or 'black as coal'" was not sufficient).

That's not to say that Edmond failed to allege workplace misconduct. But "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *See Johnson v. Advoc. Health and Hospitals Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012)); *EEOC v. Vill. at Hamilton Pointe, LLC.*, 102 F.4th 387, 402 (7th Cir. 2024) (same); *see also Jones v. Das*, 164 F.4th 1024, 1035 (7th Cir. 2026) ("'[I]solated incidents (unless extremely serious) are not sufficient' to establish a hostile work environment claim.") (citation omitted); *Swyear v. Fare Food Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that

28

are, unfortunately, not uncommon in the workplace."); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 835 (7th Cir. 2009) (finding that "relatively isolated gender-based comments and remarks [plaintiff's] supervisor directed toward her were not sufficiently severe or pervasive"); *id*. at 841 ("The sporadic comments to which [plaintiff] points do not rise to the level of an objectively hostile work environment under Title VII.").

"We expect a certain level of maturity and thick skin from employees." *Johnson v. Advoc. Health & Hospitals Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). "Discrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees." *Id*. (quoting *Russell v. Bd. of Tr. of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001)).

Successful claims involve more extreme or more pervasive misconduct. In *Johnson v. Advoc. Health and Hospitals Corp.*, a supervisor told a plaintiff that he "cleaned like a monkey," repeatedly would use the n-word, and mocked the plaintiff and other black employees. *Id*. at 901. The Seventh Circuit concluded that the "evidence that the harassment altered the terms of their employment is thin perhaps, but it is enough to survive summary judgment." *Id*. at 904.

Several times, the Seventh Circuit noted in *Johnson* that the n-word is "one of the most racially derogatory word[s] in the English language," which the plaintiff heard on numerous occasions. *Id*.; *see also Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) ("No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.") (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring)).

In contrast, the Seventh Circuit held that six incidents of harassment over the course of two and a half weeks were not sufficiently severe or pervasive. *See Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 601–02 (7th Cir. 2014).

One of the incidents of harassment involved the plaintiff being called the n-word by his coworker. *Id.* at 601. The Seventh Circuit noted that a reasonable jury could not find that "all of the allegedly harassing comments were directed at [the plaintiff]." *Id.* at 601–02.

Here, Edmond points to racially charged comments by alleging that a manager stated that "all black folks are lazy," and compared him and another black employee to "Bert and Ernie from Sesame Street."

But the pervasiveness and severity of those comments are categorically different from repeated uses of the n-word. Questions about rap and football also do not rise to that level.

And unlike cases where courts have found actionable hostile work environment claims, most of the offensive conduct was not directed at Edmond. Generalized remarks can still be actionable, but "the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Id.* at 602 (cleaned up).

Edmond also alleges that his supervisor gave him worse shifts and left additional freight out that made his assignments more difficult. And he says that Amazon shifted him between the Inbound and Outbound units of the facility more frequently than other employees.

But none of the facts suggests that Amazon gave him assignments outside of his job description. *See Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) ("[N]o reasonable jury could conclude that being assigned duties that were part of one's job description amounts to a hostile work environment. And administrative annoyances like a lateral relocation without a

decrease in pay, [and] reassignment to a cubicle . . . do not form the basis for a hostile work environment.") (cleaned up).

Edmond also offered testimony from an expert about Amazon's workforce. She opined that Amazon maintained a segregated workforce because white employees received more promotions than black employees. She opined that segregated workforces create an atmosphere where discrimination can thrive. *See* Ex. 15, Nielsen Report, at 7, 15 of 38 (Dckt. No. 139-16). That's not much of a hook to conclude that Edmond faced a hostile work environment.

### Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment.

Date: August 3, 2026

_____

Steven C. Seeger
United States District Judge